Chester James TOLLIVER,
Petitioner–Respondent,

v.

**DIRECTOR OF REVENUE,**
**Respondent–Appellant.**

**No. 24813.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 16, 2003.

Jeremiah W. (Jay) Nixon, Attorney General, Patricia D. Perkins, Assistant Attorney General, for appellant.

David S. Akers, Allman, Ingrum, Wilson & Akers, L.L.C., Branson, for respondent.

JAMES K. PREWITT, Presiding Judge.

On January 22, 2003, this Court issued an opinion in this cause. On April 1, 2003, the Supreme Court of Missouri sustained an application for transfer to that court. On September 30, 2003, the Supreme Court entered an order re-transferring the cause to this Court. The original opinion of this court, which follows is now readopted and reissued.

Pursuant to § 577.041, RSMo 2000, the Director of Revenue ("Director") revoked the driving privileges of Chester James Tolliver ("Respondent") based on Respondent's refusal to submit to a chemical test upon his arrest for driving while intoxicated.

Respondent petitioned the Circuit Court of Taney County for review. In his petition for review, Respondent contended that: (1) he was not properly under arrest; (2) there was no probable cause for his arrest; (3) the arresting officer did not have reasonable grounds to believe Respondent was driving while intoxicated; (4) Respondent's blood alcohol content was less than .10% at the time of operating the motor vehicle; (5) Respondent was not properly instructed as to the consequences of refusal; and (6) he "did not knowingly refuse to submit to a chemical test of his blood alcohol content."

After an evidentiary hearing, the circuit court reinstated Respondent's driving privileges upon its finding that "no probable cause existed for the arrest of the [respondent] at the time the arrest was made." Director appeals, presenting one point relied on:

The trial court erred in reinstating the driving privileges of Tolliver, because its judgment is against the weight of the evidence and is unsupported by substantial evidence in that the information the officers received when dispatched to the scene, in addition to their personal observations of Mr. Tolliver, provided probable cause to arrest Mr. Tolliver for driving while intoxicated.

At trial, Director offered into evidence a certified copy of its records, including the Hollister Police Department's Incident Report containing narratives from Officers Eaton and Schmidt. Neither officer was called to testify.

Officer Eaton, who was the arresting officer, filed the following narrative:

On the above date [12/16/01] and time [23:30] while on patrol, I was dispatched to Hidden Valley # 6 reference an assault. Upon arrival I made contact with the victim Wayne Watson. He advised that he had been beat [sic] up by Ches-

ter James Tolliver. He also stated that he was drunk. Officer Schmidt arrived on scene at that time and took over the scene to get statements. I then went to Tollivers [sic] house with Taney County deputy # 131 and # 133. Upon arrival I made contact with Mr. Tolliver. He was standing on his back porch. Mr. Tolliver had a drink in his hand that he had not taken a drink out of yet. I asked him what had happened at Hidden Valley. He stated that he did not know what I was talking about. He then tried to take a drink. Deputy Kempher told him not to. Mr. Tolliver got very angry and started to yell at us. He was asking if we had a warrant. I told him that we did not need one. I then asked him again if anything happened at Hidden Valley. Mr. Tolliver said it was his vehicle he damaged and that we could not do anything about it. He also stated that he would say he had been home about thirty minuets [sic] prior to us getting there and that he had several drinks and that we could not prove anything else. I then asked him if he would do some standard field sobriety tests. Mr. Tolliver said "Fuck You[.] You cannot prove I was driving." I then placed him under arrest for driving while intoxicated and leave [sic] the scene of an accident and assault. I transported him to Branson Police Department for B.A.C. Upon arrival I read him the implied consent law. Mr. Tolliver refused the test. I then read him his Miranda rights. I asked him if he understood. Mr. Tolliver again said "Fuck You." I then finished booking him and took him to Taney County jail to [be] booked into their facility.

Officer Schmidt also filed a report, which is set forth below:

On 121601 at approx. 2253 hrs. I responded to 327 Hidden Valley Rd. # 7 to assist Officer Eaton in a report of assault and leaving the scene of a traffic accident. On my arrival I met with Officer Eaton. Officer Eaton told me he was going to go with some Taney County deputies to Myrtle St. to see if they could locate James Tolliver who was the suspect in the incident. Officer asked me to get statements from all individuals involved.

I met with Jeremy Mings. Jeremy said he was in the trailer when James came into the house yelling something. Jeremy said after a minute James left. James [sic] said later James returned and was mad. Jeremy said James and Wayne (Wayne Watson) started to fight. Jeremy said he grabbed a flash light and told James to leave. Jeremy said he followed James outside. Jeremy said he saw James get into his vehicle and pull out of the drive. Jeremy said James went up the street (south) and turned around at the dead end. Jeremy said James came back towards the trailer and all of a sudden swerved into the drive and struck Carol's car. Jeremy said James then drove off. I asked Jeremy what kind of car James was driving? Jeremy said James was driving a brownish or maroon Lincoln.

I met with Carol Berry. Carol said she was James' x-wife [sic]. Carol said she lives with James. Carol said James came over to the trailer twice. Carol said the first time James came over everything was fine. Carol said James stayed a while then lift [sic]. Carol said the second time James came over she was in the bedroom. Carol said James started to yell at her and the next thing she knew he (James) was fighting with Wayne. Carol said the fight was broken up. Carol said James left the trailer and then she heard a crash. Carol said James was drunk. Carol said she was with him earlier today when he started

drinking. Carol said she owns a black Oldsmobile Cutlass. Carol said she and James bought the car but she has had it. I asked Carol if James had ever driven the car. Carol said the last time James drove it was about a week ago.

I met with Wayne Watson. I could see Wayne had a bump and a laceration on the left side of his forehead. I asked Wayne if he wanted to go to the hospital [and] he said no. Wayne said James came to his trailer twice. Wayne said he let James in both times. Wayne said he has known James for years. Wayne said James was drunk. I asked Wayne how he knew James was drunk? Wayne said he has seen James drunk and he has seen James sober and he knew James was drunk. He said the second time James came over James was yelling so he asked him to leave and that is when James started swinging and hitting him.

I met with Ruth Marsale. She said she was across the street at her house (332 Hidden Valley Rd.). Ruth said she was standing in her doorway when she heard some noise. Ruth said she saw a guy get into a car. Ruth said the guy drove up the drive and then turned around and hit Carol's car.

Ruth, Wayne, Carol, and Jeremy agreed to make written statements. Officer Eaton advised me he had James in custody.

I checked the victim vehicle (a black in color Oldsmobile Cutlass license # 066PRZ owned by both James and Carol). I could see it had damage to the right rear quarter panel. While checking the damage I could see what appeared to be small pieces of plastic stuck between the bumper and the quarter panel. I took pictures of the damage and took the pieces into evidence. Approx. nine feet from the victim vehicle I could see what appeared to be a piece of clear plastic. I took pictures of the piece and took it into evidence.

I went to 304 Myrtle Street. (Where James and Carol reside). I could see a maroon in color Lincoln Town Car [with] license # PH128 sitting in the driveway. I checked the front of the vehicle. I could see that the outer shell to the front right turn signal had been broken. I took pictures of the damage. I took some small pieces of the outer shell into evidence so that they could be compared to the pieces that I found at the scene. I went to the back of the vehicle. I could see that part of the rear reflector that runs between the two taillights had been broken. I took pictures.

At the police station I logged all evidence on an evidence log sheet. I packaged the pieces of plastic in individual paper bags and gave them to Detective Jeter (evidence officer).

The only person to testify at trial was Respondent. He testified that he had consumed nothing to drink prior to arriving home from Watson's house, where he had found his former wife "in another man's bedroom picking up her clothes." He acknowledged that he had hit his wife's car, but stated that both of their names were on the vehicle. He further testified that after the incident, he was "pretty upset" so he went home and fixed himself "a stiff drink" in order to calm down and that he had a couple of drinks while at his home.

According to Respondent, rather than the 30 minutes mentioned in Officer Eaton's report, he had been home approximately 45 minutes to an hour when the police arrived. He admitted to being angry that the police were at his home, asking them if they had a warrant, and asking them to leave his property because they did not have one. Respondent also admitted that he "got upset with the police

officers" after one of them knocked a drink out of his hand as he attempted to take a drink from it. After that point, Respondent agreed that he had "refused to do anything" requested by the officers.

In a judge-tried case, the judgment is to be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Boyd v. Director of Revenue*, 71 S.W.3d 262, 264 (Mo.App.2002). We defer to the trial court's determination of credibility. *Hinnah v. Director of Revenue*, 77 S.W.3d 616, 620 (Mo.banc 2002). However, if the evidence is uncontroverted or admitted, such that the real issue is strictly a legal one regarding the legal effect of the evidence, then there is no need to defer to the trial court's judgment. *Id.*

Under § 577.020, RSMo 2000, (Missouri's implied consent law) any person who drives on public highways is deemed to have consented to a chemical test to determine the alcohol or drug content of his or her blood. *Id.* at 619. Although a person under arrest has the statutory right to refuse a chemical analysis of his or her blood alcohol level, a driver's refusal to submit to the test generally results in the revocation of one's driver's license for a period of one year. *Id.*; § 577.041.3, RSMo 2000. Upon such a revocation, a driver may petition for review and an order staying revocation until such petition can be heard. § 577.041.4, RSMo 2000.

Section 577.041.4, RSMo 2000, provides that in a proceeding to determine whether to stay a rescission of driving privileges based on a driver's refusal to submit to chemical testing, the trial court shall determine only (1) whether the driver was arrested or stopped; (2) whether the arresting officer had reasonable grounds to believe that the person was driving while intoxicated; and (3) whether the driver refused to submit to a breath test. *Nightengale v. Director of Revenue*, 14 S.W.3d 267, 269 (Mo.App.2000). Unless all three are found in the affirmative, the trial court shall order Director to reinstate the driving privileges. *Id.* At the hearing to review the license revocation, Director has the burden of proof on all three issues. *Hawkins v. Director of Revenue*, 7 S.W.3d 549, 551 (Mo.App.1999).

Here, there is no dispute that Respondent was arrested and Respondent admitted at trial that after he became upset with the officers, he refused to comply with any requests of the officers, which included refusing to submit to a chemical test of his blood alcohol level. The only issue is whether the arresting officer had reasonable grounds to believe that Respondent was driving while intoxicated.

The trial court's only finding in the matter was that no probable cause existed. No findings of fact were made with regard to the other two elements. Where the trial court does not make specific findings of fact, we will consider those findings as having been made in accordance with the result reached, and our duty is to determine whether there is sufficient evidence to sustain the trial court's conclusion. *Hinnah*, 77 S.W.3d at 621. However, we are not required to defer to the trial court's findings when the evidence is uncontroverted and the case is virtually one of admitting the facts or when the evidence is not in conflict. *Marsey v. Director of Revenue*, 19 S.W.3d 176, 177 (Mo.App.2000). That is the situation we have here with respect to the two elements for which the trial court did not make findings.

Accordingly, we find that Director met his burden in proving the first

and third prongs required by § 577.041.4, RSMo 2000. The second prong requires that the arresting officer have reasonable grounds to believe that the person was driving while intoxicated. Reasonable grounds is virtually synonymous with probable cause. *Baptist v. Lohman*, 971 S.W.2d 366, 368 (Mo.App.1998). "There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case." *Parres v. Department of Revenue*, 75 S.W.3d 311, 314 (Mo. App.2002). Director is not required to prove that a defendant was intoxicated, only that the officers involved had reasonable grounds to believe the defendant was intoxicated. *Calicotte v. Director of Revenue*, 20 S.W.3d 588, 593 (Mo.App.2000).

 Probable cause is determined by the collective knowledge and the facts available to all officers participating in the arrest, and the arresting officer need not possess all of the available information. *Parres*, 75 S.W.3d at 314. However, probable cause must be determined on the basis of facts known to the arresting officer at the time of the arrest, not on the basis of facts learned later. *Howard v. McNeill*, 716 S.W.2d 912, 915 (Mo.App. 1986).

It is apparent that Officer Schmidt's report contains more facts than are contained in Officer Eaton's report. There is no indication in Officer Eaton's report to reflect that, prior to arresting Respondent, Officer Eaton had received the information obtained by Officer Schmidt from interviews and witness reports taken at the scene after Officer Eaton left. However, we find that the information Officer Eaton obtained on his own and the observations included in his narrative were enough to constitute reasonable grounds to believe Respondent had been driving while intoxicated.

 First, Officer Eaton had a statement from Wayne Watson in which Watson stated that Respondent was drunk at the scene. An officer may rely on information reported by citizen witnesses. *Parres*, 75 S.W.3d at 314. Respondent argues that Watson's statement was ambiguous in that Officer Eaton's report indicates "He also stated that he was drunk." Given the context of the statement and that it falls within Watson's description of Respondent and Respondent's actions at the scene, we disagree with the contention that Watson may have been talking about himself.

Further, Officer Eaton's report reflects that Respondent admitted that "it was his [own] vehicle he damaged" and that Respondent was not only arrested for driving while intoxicated, but also leaving the scene of an accident and assault. It is a reasonable inference that Officer Eaton not only had information regarding the alleged assault prior to arriving at Respondent's home, but also information regarding the damage to the vehicle allegedly caused by Respondent while driving. There is no indication in Officer Eaton's report that he was surprised or confused by Respondent's reference to hitting another vehicle. Further, in Officer Schmidt's report, he states that he arrived at the scene "to assist Officer Eaton in a report of assault and leaving the scene of a traffic accident" and that Officer Eaton informed him that Officer Eaton and Taney County deputies were headed to Respondent's residence because Respondent "was the suspect in the incident."

 Given the above information, Officer Eaton had adequate information from which it could reasonably be assumed that Respondent had been driving while intoxicated. "When an officer is possessed of facts which would justify a person of

reasonable caution to form a belief than an offense has been committed and that the person to be arrested committed it, the officer has probable cause for the arrest." *Howard,* 716 S.W.2d at 915. It is not necessary for an officer to actually observe a person driving to have probable cause to arrest the person for driving while intoxicated. *McCabe v. Director of Revenue,* 7 S.W.3d 12, 14 (Mo.App.1999).

 In fact, the question is not whether the person arrested actually was driving, but whether the officer who requested the test had reasonable grounds to believe that the person was driving while intoxicated. *Hinnah,* 77 S.W.3d at 622. Whether the arresting officer had reasonable grounds to believe that Respondent was actually driving can be established from the person's admissions alone. *Oates v. Director of Revenue,* 67 S.W.3d 664, 666 (Mo.App.2002). In addition, reasonable grounds can be based upon circumstantial evidence. *Baptist,* 971 S.W.2d at 367. Absolute certainty is not required. *Rain v. Director of Revenue,* 46 S.W.3d 584, 588 (Mo.App.2001).

Thus, we find that there was a reasonable basis for Officer Eaton to believe that Respondent was driving while intoxicated. Therefore, the trial court's finding "that no probable cause existed for the arrest of the [respondent] at the time the arrest was made" is unsupported by substantial evidence and is against the weight of the evidence.

The judgment is reversed and the cause remanded with directions to reinstate Director's revocation of Respondent's driving privileges.

RAHMEYER, C.J., and J. PARRISH, J., concur.